| | |
|---|---|
| **COLORADO CIVIL RIGHTS COMMISSION**<br>**DEPARTMENT OF REGULATORY AGENCIES**<br><br>Court Address:  1560 Broadway St,<br>Ste. 825<br>Denver, CO 80202<br><br>SYMONE PARKER and TIFFANY GRAYS<br><br>  *Complainants*<br><br>and<br><br>AURORA PUBLIC SCHOOLS<br><br>  *Respondents* | ▲  **COURT USE ONLY**  ▲<br>Case Numbers<br><br>**CP2018160052**<br>**CP2018327276**<br>**CP2019507081**<br><br>Division          Courtroom |

## COMPLAINANTS' APPEALS OF FINDINGS OF NO PROBABLE CAUSE

**COMES NOW**, minor child Symone Parker ("SP"), by and through Complainant, parent, Tiffany Grays, (collectively, "Complainants") and hereby submits these timely appeals for CP2018160052, CP2018327276, CP2019507081, (collectively, "appeals"), as the erroneous findings of no probable cause in each of the appeals, was based on information incorrectly assessed, and/or was not previously available, necessitating correction.

In support thereof, Complainants state the following:

# INTRODUCTION

1.      Complainants are both Colorado Natives, have both attended Aurora Public Schools ("APS") for over 7 years, Complainant Tiffany Grays even graduated from Aurora Public Schools; and prior to May 02, 2018, neither Complainant held any issues, incidences, complaints, lawsuits or any of the like against or concerning APS. Posthumous to May 02, 2018, Complainants have: made over 20 complaints within APS; forced to write and deliver ten Notice of Claim letters to APS(Respondents Exhibit V pp. 266-301), four lawsuits (list lawsuits and dispositions); were suspended once although this was rescinded (Exhibit 8) although the first one was rescinded (add ref to rescinded letter), and the next three were dismissed (Add ref to new evidence of dismissed cases), which leaves only one remaining frivolous trespass order, resulting in Complainant Tiffany Grays being [sic] trespassed from all APS facilities five times (list all cases and attach exhibit),(), The clear catalyst, the suspension of SP, evidently in err as it has since been rescinded(add ref to rescinded letter), has caused APS to decline to perform

appropriate, just and fair actions and forced this Complainants to bear the oppressive burdens placed upon Complainants, for reasons which can only be construed as to the race, color, and socioeconomic status of Complainant.

2.      Each Decision made by Mrs. Aubrey Elenis, Director of the Colorado Civil Rights Division, was made based on unsubstantiated statements, unverified documents provided by Respondents, and purport Mrs. Elenis' erroneous indifference to facts and evidence supplied by Complainants, and other evidence Mrs. Elenis was unable to contemplate as it did not exist at the time of the findings. In each previous rebuttal, Complainants provided evidence which substantiates findings of probable cause in each complaint, similarly Complainants will provide additional evidence within this appeal to substantiate findings of probable cause in each complaint.

3.      Respondents failed to provide during this investigation or in any previous response, legitimate factual evidence, which were not unverified statements from employees with an established conflict of interest, or evidence which substantiates Complainants alleged behavior to warrant suspending or trespassing, either of the multiple attempts. Whilst Respondents have provided over 700 pages documenting the proffered non-discriminatory actions of Respondents is inconceivable. Respondents are spending large amounts of time, effort, energy, and school funding defending actions of its employees which are said to proper.

## LEGAL STANDING

4.      C.R.S. § 24-34-601 states in pertinent part,

(2) (a) It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry.

(b) A claim brought pursuant to paragraph (a) of this subsection (2) that is based on disability is covered by the provisions of section 24-34-802.

(2.5) It is a discriminatory practice and unlawful for any person to discriminate against any individual or group because such person or group has opposed any practice made a discriminatory practice by this part 6 or because such person or group has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing conducted pursuant to this part 6.

# ARGUMENT

5.     An appeal is appropriate whereas the grounds for decision may have been incorrectly assessed, and/or when new evidence exists which was not presented in when making the initial decision.

## **<u>Probable Cause Misinterpreted in CP2018160052</u>**

### **MATERIAL FACTS IN DISPUTE: PRETEXT PRESENT**

6.     Aurora Public Schools has performed actions which contradict duties bestowed through multiple Federal and Colorado laws, and APS policies, making their advisements and statements untrustworthy. Specifically, APS has committed the following violations, which to date, Respondents have not been denied: "42 U.S.C. § 1983; 2 counts 42 U.S.C. § 1985 (2018); C.R.S. § 22-33-105(3)(a); APS: JKD/JKE-R (II)(C)(1); APS: JKD/JKE-R (II)(C)(1)(a); C.R..S. § 22-33-106(1.2)(b)(d)(e)(f); APS: JKD/JKE-R (II)(C)(4); 2 counts (each) - First (1) and Fourteenth (14) Amendment; Fourth (4) Amendment; 2 counts Breach of Contract; 2 counts Public Disclosure of Private Facts; 10 counts Racial Discrimination under Title VII; 10 counts Color Discrimination under Title VII; Intrusion Upon Seclusion; 3 counts Forgery; 50 counts Defamation of Character; Wiretap Act; 2 counts Harassment; PPRA; FEPRA, 3 counts 5 U.S.C. § 552(i)(3) and 5 counts Breach of Confidentiality." (Respondent Response ("R.R"): CP2019507081 ("7081") 11.29.18– Exhibit L pp.3-6  ).

7.     The catalytic inappropriate actions of Caucasian Principal Cari Roberts and Caucasian Assistant Principal Janelle Kirkley were with APS established errors, substantiating the ill-purposed actions of the Principal and Assistant Principal, as rules which the 10+ year APS veterans were very much accustomed, yet were intently ignored (Respondent Response ("R.R"): CP2019507081 ("7081") 11.29.18– Exhibit L pp.3-6  ). Respondents proffer the Complainants complaints are "frivolous and baseless….containing outrageous and unreasonable demands," (R.R. 7081 p.5). Yet Respondents fail to note that both Arapahoe County District Court complaints were dismissed without (emphasis added) prejudice (add exhibit of dismissal Order), and believe that the original offer of settlement of claims which Respondents have failed to provide a denial of claims letter, were [sic] outrageous. Respondent's Exhibit L pp. 10-11 express reasonable, appropriate settlement terms. How Respondents conclude that the parent Complainant attempting to provide a safe learning environment for her child, minor Complainant, as so stipulated in Colorado Law, is unethical and absurd. Respondents conclusion that a parent seeking preventative measures rises to [sic] outrageousness or [sic] harassment is ridiculousness and substantiates Respondents ill-purposed mindset, allowing citizens to be overtly disparately treated.

### **STATISTICS USED TO MAKE DETERMINATION MISINTERPRETED**

8.      Mrs. Aubrey Elenis, undersigned decision maker for Complaint 20180052, and responsible for findings of no probable cause in her decision ("Dec. 0052"). Mrs. Elenis has inaccurately assed data and statements, which allowed Mrs. Elenis to make this egregious err. Mrs. Elenis avers based solely on the statements of those who work for the government entity Respondents, that "Respondent denies treating other students more leniently," (Dec. 0052 ¶ 14 p.3). Elenis further substantiates her erroneous finding of no probable cause, on the "comparative data shows African-American students received the fewest number of suspensions in the last three years," Id.  ¶ 14, unverified statistics which display Respondents willingness to perform actions which are unlawful and unethical, forging tables and data; further exhibiting the collusion between legal counsel at Caplan and Ernest LLC, in Boulder, Colorado, and Aurora Public Schools; further substantiating Complainants' claims herein.

9.      The aforementioned unverified statistics (Respondent's Exhibit V, p. 79) fail to show:

   a.   the one Asian male who was suspended in-school on the unduplicate counts. As the Asian male count was 1, in the table titled 2017-18 Duplicate Counts number of suspension, yet the table below, titled 2017-18 Unduplicate Counts shows no Asian males being suspended in or out of school for the 2017-18 school year. If only one Asian male was suspended this would show in both Duplicate and Unduplicate (Unduplicate is a word not contained within the English language, thus Complainants use of this word is merely to indicate which fictious table Complainants are referencing, as an entire School District could not be using a word not present within the English language within legitimate documentation.)
   b.   These statistics fail to show the bully, C, who was suspended multiple times in 2017-2018. All Black males that were suspended out of school were in 5th or 8th grade, C was in 6th grade.
   c.   The Duplicate table states that one white 6th grader was suspended once in school and out of school suspension, yet under the Unduplicate table, the same white 6th grader was suspended only out of school. In school and out of school are not the same, therefore, the data is manufactured, as the same information would appear on both tables, as duplicates refer to the same student receiving multiple suspensions, as indicated in the Division's Decision ("D.D. 0052" ¶ 09, p. 2).
   d.   C received In-school suspension, which is not indicated on either the Duplicate or Unduplicate tables. Further substantiating the data as manufactured only to proffer white students as being punished more severely and frequently then non-Caucasian students, which cannot be relied upon as the statistics expresses data which at minimum is verified as incomplete and is justifiably untrustworthy.
   e.   SP got into a physical fight with Hispanic Kayla Aguilar, who received In-School Suspension, while SP received three days of community service. The In-School suspension of Hispanic, 6th Grade female, Kayla Aguilar is missing from the manufactured data (Respondent's Exhibit V, p. 79).
   f.   The statistics also fail to include the suspension of SP
   g.   The unduplicate table Respondent's Exhibit V, p. 79). expresses the duplicate number of suspensions for the 7th Grade white male, as the duplicate table expresses one in-school suspension, while the unduplicate table expresses two in-school suspensions;

Exhibit G

h. Respondent's Exhibit V, p. 95 expresses Marcelina Rivera's conversation with persons responsible for the erroneous suspension of SP, Assistant Principal Janelle Kirkley and Cari Roberts, noting themselves that C, an African-American 6th Grader, was suspended on 4/18[18], yet this suspension is not listed on either fictitious table, pp. 79 or 302;

i. Respondent's Exhibit V, p. 98 (bullet point 4), states "Neba was suspended for 1 day for her detrimental behavior," yet this suspension is not listed on either fictitious table, pp. 79 or 302, as Neba is not white;

j. These statistics provided within p. 79 conflict with Exhibit V p. 302 statistics for the 2017-2018 school year in the following ways:

   i. According to p.302, there are no females suspended from Aurora Frontier. According to p. 79 there was one white female;

   ii. According to p.302, there are no Asians suspended from Aurora Frontier. According to p. 79 there was one Asian male suspended;

   iii. According to p.302, there were no Blacks suspended from Aurora Frontier. According to p. 79 there were two Black males suspended;

   iv. According to p.302, the 6th Grade Hispanic male whom was suspended multiple times, was suspended a total of three times. According to p. 79 (duplicate table) this Hispanic 6th grade male was suspended four times;

   v. According to p.302, there was NOT a 5th Grade Hispanic male suspended. According to p. 79 (duplicate and unduplicate table) there was one Hispanic 5th grade male suspended;

   vi. According to p.302, there was NOT a 6th Grade White male suspended. According to p. 79 (duplicate and unduplicate table) there was one White 6th Grade male suspended out of school;

   vii. According to p.302, the 7th Grade White male was suspended in school. Yet, according to p. 79 (duplicate table) there was one White 7th Grade males suspended in school and one suspended out of school, for a total of two white males being suspended.

   viii. Page 302 bifurcates "Third Degree Assault" and Fighting/Physical Aggression with Student," while the Aurora Frontier 2017-2018, construes these as one in the same, resulting in the same punishment, further establishing the manufactured table as a farce.

10. In the 2017-2018 school year, Aurora Public Schools reports Aurora Frontier as having the following number of students in each ethnic group (3) (exhibit #) found at http://accountability.aurorak12.org/wp-content/uploads/sites/203/2018/02/2017-18-Disaggregated-School.pdf): 0 – Native America; 116(17.3% of AF population) – Asian; 77 – Black (11.5% of AF population); 188 – Hispanic (28% of AF population); 246 – White (36.8% of AF population); 1 – Nat. Haw (.01 percent of AF population); 39 – Two + ethnicities (.06 of AF population); totaling 667 students in all. Of the 667 students enrolled, 71(#) (http://accountability.aurorak12.org/wp-content/uploads/sites/203/2018/02/2017-18-Student-Enrollment-by-School-and-Grade.pdf) were in 6th grade, the same as the Complainant S.M.P. at the time of this incident, 5th and 7th grades each had 70(#), and 8th grade held 78 students (#), totaling 289 students. Students in grades 1st through 4th total 304. According to the statistics provided on page 3 of 28 within Respondent statement, students in grades 1st through 4th receive

less severe punishments, out of school suspensions, than students in grades 5th through 8th. 43% of Aurora Frontier is in grades 4 – 8, yet these grades saw 80% of the total out of school suspensions for 2017-2018. Similarly, while Black children make up 11% of the entire population of Aurora Frontier, Black children, only males, make up 25% of the out of school suspensions, according to Respondents statistics, expressing the targeted mistreatment of this small population of the school.

11.     The only statistics in Respondent's Response which remain consistent in Respondents manufactured data, is the fact that both the unverified statistics (Respondent's Exhibit V, p. 79) and the table label Attachment #5 (Respondent's Exhibit V, p. 305). Validates the disparate treatment of SP and all other Blacks at Aurora Frontier, as only white children receive the less harsh in-school, level two suspensions, for the exact same crimes. Blacks and Hispanics are never given this option of the less harsh, in-school suspension, and only given suspension out of school. The white administration at Aurora Frontier favor the white children, by giving them lenient punishments which are at the administration's disposal and intently withheld from children who are non-white. Lastly, and most importantly, according to Respondent's proffered manufactured data, (Ex. V p. 302) SP was the only black female suspended out of school from Aurora Frontier, for the purported "three years prior," R.R. 0052 ¶10 p.2, for what is described as an accidental touch (Ex. V, pp. 111, 140-142) because girl N approached SP(Ex. V, pp. 111, 140-142), who had her back turned(Ex. V, pp. 111, 140-142), facing the opposite direction(Ex. V, pp. 111, 140-142), adhering to the agreed upon terms(Ex. V, pp. 111, 140-142), simply trying to give a friend a Hi-5(Ex. V, pp. 111, 140-142), not bothering, talking about(Ex. V, pp. 111, 140-142), or thinking of girl N(Ex. V, pp. 111, 140-142); and considering there was no fight, no intent of SP to touch girl N, and the touch was not considered third degree assault (According to Respondent's Exhibit V p.302, the year in question, 2017-2018, was the year in which Aurora Frontier performed the most suspensions, based on third Degree Assault. According to the Aurora Frontier 2017-2018 Handbook, the Assistant Principal and Principal were to conduct the following actions when a student was deemed to have committed Third Degree Assault. Third Degree Assault at Aurora Frontier for the 2017-2018 year is defined as "fighting, intent of making physical contact, making physical contact." When a student makes physical contact, they are to be suspended out of school for 1-3 days, and police are to be involved.", the Assistant Principal failed to involve police.)(Ex. ?? p.16) making the suspension of SP arbitrary.

## DIRECTOR'S MISINTERPRETATION OF EVIDENCE

12.     Proof that 109 is incorrect as the [sic] hit is noted to have occurred on May 2nd, but the within the official form Cari Roberts and Janelle Kirkley made SP use to provide her statement, and not any other child who wrote a statement (Complainants believe this expresses the mendacity of the Assistant Principal, the formality of the suspension correctly observed in taking the statement of SP, in attempts to validate the frivolous suspension) (Exhibit V pp. 110, 112-114), which is proffered to the Division as valid, factually states (This statement is two pages, Respondents fail to include the second page): (1) the statement is being written on May 02, 2018; (2) states the meeting between SP, N, and Assistant Principal Janelle Kirkley was conducted and occurred on May 01, 2018 (Exhibit V pp. 108, 109, 111, 140-142); (3)

contradictory to statements provided by Respondents, SP's [sic] hit of N also occurred on May 01, 2018, a whole day prior to the suspension

13.     Mrs. Elenis' findings are erroneous as they are based on data which fails to delineate the demographics of the school itself, as this data would support the disparate treatment of African-American children at Aurora Frontier, as African-Americans make up less than 1% of the population at the school, yet make up 21% (#) (By using these statistics provided within Dec. 0052, and were provided to the Division from Aurora Public Schools, Complainants in no way authenticate or validate this data, and believe the data to be manufactured) of suspensions; the findings fail to address the bullying which S.M.P. endured, and how the school failed to suspend the African-American bully for physical contact, which the school also defines as detrimental behavior; the findings fail to address the prolonged complaint time, from girl "N," who waited an entire day to report the [sic] hit, after having just left the Assistant Principal's office or the fact that girl "N," did not scream out in pain, no other child felt compelled to report it on her behalf, the teacher observed no issue within the classroom, nor was there any interruption to the lesson; the findings fail to address the fact that the school's rescission of the suspension was admitting the decision to suspend was made in err; the findings misstate the following facts: citation 2, states a meeting that never took place. Furthermore, the fact that this "contract," is being noted within this Complaint expresses not only the government entity, but also this Division participation in denying the public accommodation requested, as the aforementioned "contract" was between S.M.P. and C(#). (The Division erroneously exposes a minor child's name Chad, who is African-American, yet shields the non-African-American, 'N' from such scrutiny, further evidence of the scinter of those performing investigation, participation and collusion).

14.     The statement provided by one of the children involved, fails to implicate SP as the aggressor or the instigator. In fact, Deyjiah is named eight times, whereas SP is named only once (Ex. V p. 126); further substantiating the disparate treatment by AF staff towards SP a dark-skinned African-American.

15.     Further evidence of the disparate treatment is Respondents forgery, as Respondents Exhibit V pages 25 & 27, shows the Assistant Principal's', Janelle Kirkley's real signature; clearly revealing the forged signature on page 26, the catalytic suspension document, which defendants have chosen to include in not one, but now two official discrimination investigations and cannot be ignored. Defendants have lost respect for the judicial process, the duties bestowed upon the Colorado Civil Rights Division and themselves, as to include materials which are overtly fictitious, and can only induce inappropriate justice. Defendants have failed to provide any response or denial in opposition of Plaintiffs' forgery statements, therefore have admitted the document provided as authentic, twice now, is fraudulent. Respondents failed to issue appropriate documentation upon suspension or anytime thereafter, following numerous requests by the Complainant (#) (Emails showing unresponsiveness by Janelle, Cari, Superintendent.)

16.     To prevail on a claim of discriminatory denial of the full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation, the evidence must show, (1) the Complainant is a member of a protected class (African-American); (2) the Respondent is a place of public accommodation (Public School District); (3) the Complainant sought goods, services, benefits or privileges from the Respondent (S.M.P. was enrolled in Aurora Public

Schools, at Aurora Frontier from 2014-2018); (4) the Respondent provides the goods, services, benefits or privileges sought by the Complainant to other persons(Ref pages of response that includes other children involved who were not suspended and/or children whom were known to have been in "physical contact" with other students and did not receive out of school suspension); (5) the Respondent refused to provide Complainant the goods, services, benefits or privileges sought by Complainant(Complainant was in deed refused education, the services and benefits at Aurora Frontier on May 03, 2018); and (6) the circumstances give rise to an interference or unlawful discrimination based on a protected class (Given other students implicit participation in the events leading up to the suspension, to include the bully of S.M.P. were not suspended out of school and the suspension was determined by Respondents themselves to have been issued in err, as Respondents rescinded the suspension (Add Exhibit Ref);

17.     Director Aubrey Elenis ("Director") failed to contemplate any of Complainant's evidence, as none is referenced within any of the three Decisions provided by the same investigator, the Director. Respondents held knowledge of and never adhered to Respondents' own anti-bullying policy 2017-2018 (Add handbook p.14 Exhibit, Exhibit V p. 270) regarding the numerous bulling events occurring over four consecutive years between Complainant and C, two dark-skinned African-American children. C was allowed to physically, emotionally, and verbally bullied (Ex. ?? p.14) the Complainant, by and through the intentional inaction, the complicity of the Principal, Assistant Principal and Dean, whom are all Caucasian. Specifically Respondents failed to "(1) Failure to employ their own definition of bullying; (2) Failure to follow the purposeful attempt to hurt or harm of bullying; (3) Failure to have students fill out witness forms when witnessing bullying; (4) Failure to adhere to bullying three (3) strikes policy; (5) The school counselor is not overseeing nor managing the three strikes process; (6) Failure to enforce apology letters; (7) Failure to enforce two (2) acts of restitution; (8) Failure to implement Positive Behavior Support Plan; and (9) Failure to increase consequences in accordance with Pyramid of Intervention. The disparate treatment this student endured for years, is unfathomable," (Exhibit V p.270 ¶2; Id. p. 14)

18.     The Complainant, an African-American, therefore a member of a protected class, sought the services, benefits and privileges from Respondent Aurora Public Schools, a place of public accommodation with over 36,000 students (Exhibits 10-12), as a student enrolled at and at the time of this incident and was attending Aurora Frontier for four consecutive years, 2014-2018. The Respondent refused to provide the Complainant the services, benefits and privileges sought by and through the one-day suspension from school on May 03, 2018, when school was in session for every other student of Aurora Frontier, every one of the other 36,000 students in Aurora Public Schools. Given the Complainant never having been previously suspended or ever having received a referral, to receive a level 3 punishment is arbitrary and pretextual; giving rise to the unlawful discrimination based on color and race.

## Probable Cause Misinterpreted in CP2018327276 & CP2019507081

19.     Respondent's Exhibit V, p. 99, ¶1, expresses the Dean's opinion, as relayed to Marcelina Rivera, establishing the disparate treatment of African-American mother. Another parent who used "inappropriate language in the front office and the result was just that Cari had a conversation with the parent, not issue a No Trespass. The parent was white," was unconsidered

by the Division, therefore misinterpreted, as there is no statement regarding this fact within the Decision.

## DIRECTOR'S MISINTERPRETATION OF EVIDENCE

20.     Director's Decision was partly based upon the misinterpretation of the [sic] discrimination investigation performed regarding APS employees, by APS employees, (Director's Decision ("D.D.") CP2018327276 ("7276") ¶10 p. 3), all of whom are willing to commit fraud and forgery Many contradictions noted within Complainants Response were not considered by the Director, in err. These errs include:

   a.   "Marcelina flip-flops in the formal investigation started saying the suspension was detrimental behavior, then in ¶3 states the physical contact and verbal word were the reason," (Complainant's Response 0052 and 7276 ¶7);
   b.   Marcelina fails to note the many verified APS procedural errs of Janelle Kirkley's erroneous suspension of SP:
      a.   JKD/JKE-R (II)(C)(1) (Ex. V p.280);
      b.   JKD/JKE-R (II)(C)(1)(a) (Ex. V p.280);;
      c.   JKD/JKE-R (II)(C)(4) (Ex. V p.280);;
      d.   AC,
      e.   AD,
      f.   CFA,
      g.   ADHA,
      h.   ADH,
      i.   ADF/ADF-R,
      j.   CB/CI
      k.   CBA/CBC
   c.   The many inconsistencies within Marcelina's report noted by Complainants, were not considered or interpreted by the Director, (Complainant's Response 0052 and 7276 (A)(B)(C));

21.     But for the suspension, the trespass would have never occurred. The Complainant was denied full and fair opportunity to use the services and benefits of Respondents, to participate in her Children's education, as all other parents within Aurora Public Schools, by and through (1) forcing the Complainant to seek clearance unnecessarily, which has been denied (add exhibit of email to all after aug 24 trespassing); (2) (add email exhibit) requiring the Complainant to communicate through Aurora Public Schools external paid legal counsel regarding the Complainant children's education (Exhibit 9); (3) denying the ability of Complainant to communicate with her Children's teachers; all resulting in Complainant being denied the benefits of Respondent's services. Complainant has been forced to have her mother pick up her child from school, by and though fear of further trespassing (add email from trish).

22.     The Director misconstrued Respondents evidence, stating Complainant contacted the Superintendent after the rescission, D.D. 7276 ¶10 p. 3, yet Respondents offer internal correspondence on May 09, 2018, stating "Ms. Grays came into the Office of the Superintendent today," continuing quoting Ms. Grays as having said, "at what point does the Superintendent get

involved?" (Respondent's Exhibit V p. 144). The Complainant made multiple efforts to contact the Superintendent and to resolve all issues, to include the issue with SP's bully, C.

23.     D.D. 7276 ¶11 p. 3, avers "the Complainant visited Respondent's HR Department and demanded that they turn over employee files, and when the staff refused, she became "loud, vulgar, and verbally confrontational." The Respondent avers it had to call Campus Security and the Aurora Police Department to remove the Complainant from the premises." The Director does not contemplate Complainant's evidence submitted, Complainants Response Sept. 01, 2018 A(4). While the Director is correct in affirming Respondents "refused," yet fails to note the denial to publicly inspect files, which are stated to be available for public inspection, is egregious. Complainant held every right to be upon premises and to request inspection of public files, per APS policy (Add exhibit), which is why responding Sargent declined to arrest or trespass Complainant, against APS Security requests.

## RELEVANT EVIDENCE NOT PREVIOUSLY AVAILABLE, PRESENTED, AND/OR CONSIDERED

24.     Respondents collusion is evident within the multiple attempts to trespass Complainant Tiffany Grays from all Aurora Public Schools properties, six to be exact: (1) May 07, 2018 – APS Internal Trespass; (2) July 12, 2018 – Aurora Police Department decided not to trespass or arrest Complainant; (3) August 31, 2018 - Aurora Police Department J242871; (4) September 18, 2018 - Aurora Police Department J242854; (5) February 05, 2019 - Aurora Police Department J224105; and (6) May 20, 2019 - Aurora Police Department J242854. All but one have been dismissed, and Respondent's case on the soon to be dismissed with prejudice final sixth frivolous trespass order expresses its fragile state. Respondents will not deny Complainant's right to be upon property, as evidence exists to exonerate Complainant from all erroneous egregious exaggerations from Respondents.

### (1) May 07, 2018 – APS Internal Trespass – RESCINDED

25.     The Director's misinterpretation of the rescission of both the catalytic erroneous suspension of SP, and the subsequent erroneous trespassing of Complainant Tiffany Grays, does give rise to probable cause of discrimination, based on race and color, as APS rarely performs rescissions of one, yet alone two. The Director does not contemplate the temporal proximity of the Complainant's addressing the APS School Board on "May 15, 2018," (D.D. 7276 ¶10 p. 3) and the performance of APS in attempting to erase the erroneous actions of its veteran Caucasian employees with a rare rescission on May 17, 2018, two days later Id. ¶10 p. 3. The act of rescission is one of admission, as the act is rarely performed, left for only the most egregious employee errs.

### (2) July 12, 2018 – Aurora Police Department decided not to trespass or arrest Complainant – DECLINED

26.     "Why Mr. Eyre brings up the events of July 12, 2018, baffles Ms. Grays. Defendants willfully denied legal right to publicly inspect personal files as outlined the policy KEB. APS attempted to block my access by calling APS security who showed up 3 deep. Ms. Grays

immediately called the Aurora Police to assist, but Aurora Police Department failed to aid Ms. Grays intently for 35 minutes causing the situation to escalate. Further the APS security officer C. Moore attempted to escalate the situation by lying about Ms. Grays actions and antagonizing Ms. Grays. This can be validated with the video available. The video Ms. Grays recorded of the APS employees illegal actions is available here, https://www.facebook.com/tiff.549/videos/pcb.142827999940423/142822823274274/?type=3 (Complainant's Response 0052 and 7276 ¶4);

27.     As evident in the video, Complainant is neither loud, vulgar, verbally confrontational.

### (3) August 31, 2018 - Aurora Police Department J242871 – DISMISSED

28.     Dismissed **(Exhibit 5)** after arrest, bond, imprisonment, court dates, time, energy, and damage to Complainant's reputation per Complainants Motion to Dismiss.

### (4) September 18, 2018 - Aurora Police Department J242854 – DISMISSED

29.     This Summons was executed by the same APD Officer, Michelle Hanley, whom issued the first summons which was dismissed on November 19, 2018. According to the documentation, this one, which is alleged to have occurred on September 18, 2018, is allegedly not reported to Aurora Police Department until November 16, 2018 **(Exhibit 6)** questionably having its warrant issued just one day after the first one is dismissed, on November 20, 2018 **(Exhibit 4)** Dismissed after arrest, bond, imprisonment, court dates, time, energy, and damage to Complainant's reputation per Complainants Motion to Dismiss.

### (5) February 05, 2019 - Aurora Police Department J224105 – DISMISSED

30.     Dismissed **(Exhibit 7)** after arrest, bond, imprisonment, court dates, time, energy, and damage to Complainant's reputation per Complainants Motion to Dismiss.

### (6) May 20, 2019 - Aurora Police Department J242854

31.     On May 20, 2019, after nine months, the City of Aurora, dismisses **(Exhibit 4)** the original charge, amends the charge to another ordinance violation under Aurora Municipal Code, making this the fifth denial of public accommodation, based upon the same address, actions, and facts; thereby substantiating the harassment and unlawful denial of public accommodation, as surely if trespassing was warranted, it would not take an entire year and multiple charges and warrants to do so.

32.     Under Subpoena Duces Tecum, Complainant obtained a report from Aurora Police Department concerning all persons trespassed from all Aurora Public School properties for the past five years. While Respondents contend trespassing "students and others is common district-wide," (R.R. 7276 p.2 ¶7), of the two hundred and seventy (270) persons trespassed, (1) the Complainant parent is the only one to have been trespassed from the Education Services building, (2) trespassing involving elementary schools is rarely performed in contradiction of what Respondents commonplace fable (R.R. 7276 p.2 ¶7).

# CONCLUSION

33.     Complainants are "providing direct evidence discrediting Respondents proffered rationale (Exhibits 1-20)," *Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1234 (10th Cir. 2015) (internal quotation marks omitted), by "showing that the plaintiff was treated differently from others similarly situated," *Loundis; Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

34.     When weighed as a whole, the mendacity, fraud, conflicting statements described herein and in Complainants previous responses, surmount to pretext and a deprivation of rights, privileges, benefits and services, initially performed due to Complainants race and/or color, subsequently in retaliation for charges of discrimination; as no other legitimate reason exists for the government entities established erroneous suspension and trespasses, as all have been either rescinded or dismissed. Complainants pray for correction, a findings of probable cause.

Dated June 14, 2019

Respectfully Submitted,

_____

Tiffany Grays

**Exhibit V Refs**
**108 – Cari Roberts Children Timeline**
**109 – Hand written notes on Discipline Action Levels**
**111 – SP May 02, 2018 Written Statement**
**116-117 Janelle real handwriting and signature**
**119 – Forged Due notice of suspension, notes TBD in violation of APS policies**
**120 – Janelle real signature**
**140 – 142 SP typed statement supporting written statement of May 01**
**266 – 301 Notice of Claim Letters**